WYNN, Judge, dissenting.
This case goes to one of the most basic questions in our democratic system: which branch of government should decide fundamental policy questions affecting our citizenry. Here, the majority would substitute its judgment for that of the executive or legislative branch as to what funding and treatment are available to a juvenile who appears to be an unauthorized immigrant who has been convicted of a sexual offense. Indeed, it may well be that the majority is correct in its conclusion that the federal government would not permit funds to be used to treat juvenile sex offenders who are unauthorized immigrants to this country. Nevertheless, because such a decision should not be made by the judiciary in the absence of clear administrative or statutory law, I dissent.
It is undisputed that there is no definitive legislative or executive ruling that interprets the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA) and explicitly disallows the type of treatment being provided to this juvenile as an impermissible public benefit. However, in the instant case, such a finding is a necessary prerequisite to concluding that a "change of circumstances" has occurred, sufficient to merit modifying the disposition. Here, the record discloses that the juvenile was undergoing sex offender treatment when Burke County sought to demonstrate that there had been a "change of circumstances" in his situation, namely, that federal funding would be cut off if the treatment was provided to him. In affirming the trial court's finding to that effect, the majority states that, "there is competent evidence in the record to support the trial court's finding" "that due to a lack of funding pursuant to State and Federal law the juvenile's Level III placement is no longer available to the Juvenile." In fact, the record contains no such evidence.
To the contrary, the trial court's findings of fact specifically state that "the various agencies responsible for D.G.'s placement alleged that there were insufficient funds"; that the State and County "argued that they are precluded by State and Federal law from using Federal funds to provide the previously ordered placement"; and that "due to a lack of funding pursuant to State and Federal law said placement is no longer available to the Juvenile." (Emphasis added). Such "allegations" and "arguments" do not constitute evidence. Rather, these findings are mere recitations of the State and Burke County DSS positions, as well as that of the Foothills Area Program attorney.
Significantly, the sole document in the record indicating that the juvenile's treatment would be disallowed under PRWORA as a state or local public benefit provided to an immigrant who appears to be unauthorized is the letter from the Foothills Area Program attorney expressing his opinion on the matter. However, contrary to the majority's characterization that this letter was "based upon an opinion obtained from the Office of the North Carolina Attorney General," the memorandum from the Attorney General's office explicitly states that it is only an "advisory letter" that has "not been reviewed and approved in accordance with procedures for issuing an Attorney General's opinion." Thus, the memorandum has no legal force or effect.
Moreover, while the trial court designated as a finding of fact that, "due to a lack of funding pursuant to State and Federal law said placement is no longer available to the Juvenile," that determination is instead a conclusion of law. As noted herein, that conclusion is not supported by findings of fact based on competent evidence, as no evidence in the record before us shows that either state or federal funding has been cut off for, or due to, the placement of this juvenile. Indeed, there has been no legal determination that sexual offender treatment is an impermissible "public benefit" within the meaning of PRWORA, and this Court should decline to make such a ruling based only on allegations and arguments, which do not constitute evidence.
Rather, these types of policy decisions are best left to the other two branches of government, as the judiciary is simply not equipped - nor intended - to undertake the *462 balancing of relative interests necessary to make such determinations. Here, for instance, the decision to provide sex offender treatment to juveniles who are unauthorized immigrants requires weighing that cost against other policy priorities, such as public health and safety. Significantly, the Attorney General's memorandum acknowledged this conflict between a possible benefit provided with the purpose of protecting the public:
... It would appear that providing psychiatric treatment would be a benefit unless one of the exceptions applies.
A person who is a danger to himself or herself would appear to fit the definition of an emergency medical condition and thus be able to be treated under that exception. A person who is a danger to others does not appear to meet any stated exception. However, it seems to me that, if the commitment is for the purposes of public safety, any benefit received by the person is incidental to the protection of the public.
(Emphasis added). Thus, the Attorney General recognized that the legislature or executive branch may decide to allow a public benefit such as funding for sex offender treatment if the commitment is for the purposes of public safety. Again, the policy determination as to what type of funding should be available to county departments should not be made by the Courts.
The facts of this case illustrate the competing policy considerations at issue in such a decision. According to the record, after coming to the United States at the age of fourteen, the juvenile in question attended public high school in Burke County for one year while living with a paternal uncle and his wife. The juvenile has numerous other relatives living in the Burke County area and few remaining ties to his home country of Guatemala, as his father was murdered in Valdese, North Carolina, shortly after immigrating here after the juvenile's mother abandoned the family when the juvenile was four years old. Perhaps most significantly, the juvenile's paternal uncle was in the process of adopting him when the juvenile committed the sexual assault.
The record before us makes no mention of what will happen to the juvenile after he completes his disposition or turns eighteen. If the juvenile is not deported and instead returns to live in Burke County, then his treatment as a sexual offender is even more critical from the perspective of the public safety of our citizens. All parties agree that the juvenile was cooperative and responding extremely well to the treatment prior to being taken out of Hands Up Homes and the initiation of this action.
Again, these facts demonstrate that the disposition of this juvenile necessitates a determination of whether the sexual offender treatment is an impermissible "public benefit" or simply a benefit that is "incidental to the protection of the public." Judicial prudence requires us to leave these policy questions to our legislative and executive branches of government, as their constitutional role is to establish and administer laws that weigh and balance such competing interests. Our role is to apply the law, not to make it.
In sum, because the majority's holding constitutes an impermissible advisory opinion on the availability of state and federal funding for a juvenile in these circumstances, I dissent. Judicial restraint dictates that we refrain from acting in the stead of our legislative and executive officials. For that reason, I certify this question to provide an appeal as a matter of right to our Supreme Court. See N.C. Gen.Stat. § 7A-30(2) (2007) (providing an appeal of right to the Supreme Court "from any decision of the Court of Appeals rendered in a case in which there is a dissent.").